And the court will proceed to the second case of the day, the United States v. Wilbourn et al. Judge, we've divided up, I think we have 25 minutes, we've divided up, I'm going to take... My understanding is that you would have 12 minutes and then three for rebuttal and Mr. Nash would argue for five and five for rebuttal. Correct. I'm going to address two issues from our joint brief. The first issue is that our claim that Mr. Wilbourn was entitled to a new trial where the government elicited prejudicial and false evidence against him after he had rested his case. The second issue that I would like to address is the sentencing issue and that is our claim that the district court misapplied the guidelines in sentencing Mr. Wilbourn to a very lengthy sentence. Issue one, after Brian Wilbourn rested his case, his co-defendant called the case agent as his witness and introduced a videotape recording of an undercover drug purchase at the Cabrini-Green building on August 10, 2006. The point of this evidence for Mr. Rondell Freeman was he wanted to show that he wasn't in control of all the drug dealing at the building. His personal brand was Blue Devils. The cooperating witness went in there and asked to purchase Blue Devil bags with Blue Devil stamps on them. No Blue Devils were for sale. He ended up purchasing bags from other drug sellers that had other markings on them. Before playing the tape, Judge Lafko instructed the jury that it was, quote, not to be considered against the defendants like Brian Wilbourn who had rested their case. After the tape was played, the government lawyer got up and asked a single question of the case agent. And that was, you heard people yelling Orange Stripes. And as everyone in the courtroom knew, Orange Stripes was Mr. Wilbourn's personal brand. And the question is repeated one more time to make sure that the jury gets the point. That in fact it wasn't Rondell's drugs that were being sold that day, it was Brian Wilbourn's. This was prosecutorial misconduct. It was a gratuitous shot directed at a defendant who was. Was it false? We believe it was false, Judge. On what basis? Well, we've submitted the tape recording. We've supplemented the record with the tape recording. If you listen very closely, which I have now, you don't hear anyone mention Orange Stripes. Was there any effort made, Mr. Goodman, I understand your position. It's the kind of thing that can happen in a multi-defendant trial if some people want to put on evidence and others don't. I would think that the natural solution to this would be A, object, or B, if there's a problem, ask for an opportunity to reopen the evidence for your client. I'm sorry, ask for what? The opportunity to put on rebuttal evidence. Honestly, Judge, what happened is this was not, this tape recording, there was dozens of tape recordings that we reviewed in connection with this case. This one had nothing to do with our client. We didn't review it. We watched it with the jury at the trial. It was hard to hear. Did you ask for a recess so you could evaluate it? I mean, asking us to turn over the results of a trial on the basis of a problem that could have been fixed so easily is a little tough. We didn't, Judge. All I can say is that we accepted the truthfulness of the agent's testimony that, in fact, orange stripes could be heard on that tape. It wasn't until later that we performed a much closer examination of the tape and also looked at the ATF report and saw that, in fact, it wasn't orange stripes. You could not hear orange stripes on the tape. So, yes, we should have been more diligent at the time. In fact, it wasn't until later. But, you know, I felt that the agent was not going to agree with the prosecutor that, in fact, you could hear it on there if it could not be heard. So you're correct, Your Honor, that it could have been. We do know there were issues about the integrity of the government's case in that trial, correct? Yes, Judge. Certainly we vigorously contested those issues. This one slipped past us until the appeal. We do believe it was prejudicial, and we do believe that Mr. Wilborn was harmed by this evidence. And, you know, this court has looked at a six-factor test. We believe those factors do favor a new trial in this case. And I just think the important thing to point out is that the defense had elicited testimony that Brian Wilborn was not selling drugs by the summer of 2006. He was working at a car wash. This testimony, which we believe was false and should not have been entered, completely ruined Mr. Wilborn's credibility and the credibility of our defense. Mr. Goodman, will you or Mr. Nash be talking about the phone counts? No, I will not be. No, you're out. To me, this is so obscure. And, again, it's not the tape that was problematic. It was the testimony of the agent who said that you could hear someone. The tape that wasn't in it, I guess. Correct. And so, basically, what the testimony was is Brian Wilborn's drugs were certainly being sold that day in August of 2006. That was prejudicial testimony. And, again, our focus at the time. How did the judge deal with that? The judge did not revisit it. How did they ask him to deal with it? We filed a motion. We asked for a mistrial. The judge clearly agreed that it was improper, but the judge said, I'll deny the mistrial. She did not revisit it and instruct the jury to ignore that. Any instruction requested or anything? No. I think we ought to leave it alone at that point. I'd like to move on to the issue of the sentencing. As this court found in its prior opinion, the government knowingly used false evidence to convict Mr. Wilborn on the conspiracy count. The case was remanded and proceeded to sentencing on the remaining counts. Wilborn was sentenced on four substantive drug counts, all of which occurred within a 17-day span in the spring of 2006, and involved less than 50 grams of cocaine and 50 grams of heroin. Most of these counts involved Brian Wilborn's personal drug dealing. Rondell Freeman wasn't even named in the two most serious counts. Mr. Goodman? Yes. I've read Judge Lefkoe's rather detailed opinion dealing with this problem, and I've got to say, as I understand it, she did not count against Mr. Wilborn drug sales from before his 2002 prison term. Am I correct about that? That's correct. It was from 2002 to 2007 were the five years, yes. Now, I know you've emphasized that 17-day period with the substantive counts, but she described pretty extensive evidence after his release from prison where he's involved with Freeman, and let's say reasonable people can differ about how much of it is about just what his relationship with Freeman is. I'm concerned about holding him responsible for drug distribution while he's in prison, and can you help us quantify what's at stake if we were to say there's not enough evidence for the time he was in prison, but there is after his release? Yes. This was an unusual, I understand, first of all, I think he was found responsible for some drug dealing prior to the time he went to prison. I think that that five-year period begins before he went to prison, so I think it does include some drug dealing prior to. I understand the court's point, but this was an unusual sentencing because it wasn't, generally when people are sentenced on substantive counts, you look at relevant conduct. Well, how much drug dealing were you really doing? That's not what happened here. Yes, he was actively involved with selling drugs. We dispute that he was working with Rondell Freeman at any time, but he certainly was actively involved with selling drugs in the spring of 2006, and that's where those substantive counts lie. In terms of other amounts that he sold during that period or that he was personally responsible for, there was never any attempt to calculate that. It was just he's responsible for the crimes of Rondell Freeman as if he was part of the conspiracy. Yes, and we know that that's possible, that that can be done, and so what I'm asking you to do is help me break out quantitatively drug sales or whatever the district judge was attributing to him while he was in prison as opposed to other quantities while he's out and actively selling and spending time with Mr. Freeman. I don't know that I can do that, Judge. I would say that that would require a remand. Did the probation office try to do that? I don't believe so, no. I hope the government can help me on that. What I would say, Judge, is the first problem with that analysis, and I understand it can be done, but first there has to be a finding that the crimes of conviction are part of a jointly undertaken criminal activity. In that case, yes, if he were... Don't we have that finding from the district court? We do not have that finding, Judge. The district court did not make such a finding and could not have made such a finding on these facts. The counts of conviction were substantive drug counts based on Brian Wilborn's personal drug selling. There was no connection with... Basically what the judge found is that... The review of the record, however, demonstrates that Wilborn's counts of conviction have strong ties to the Freeman DTO. This is Appendix 41, and she goes on from there. Yes, the judge... But there is no finding that the counts of conviction are jointly undertaken criminal activity. That's the point. The judge says, yes, there is a connection because you used Rondell Freeman's apartment to store your drugs and to package your drugs. You used a similar modus operandi, and Rondell Freeman's crimes were foreseeable to you. That was the judge's finding. She never made a finding that his crimes of conviction, those substantive counts, were in fact a joint enterprise with Rondell Freeman or with anyone. Nor could she have made such a finding because those counts of conviction involved his personal drug business. Although Wilborn would have the court believe that each man worked independently of the other, the more likely conclusion is that he, Wilborn, was involved in preparing, packaging, distributing, and selling drugs for Freeman. Now, that may be wrong, but that sounds like a finding to me. Yes, the point that I'm making, Judge, is that is not a finding that has to do with the counts of conviction. I'm reading from the same paragraph where she's laying out why she's going to hold Wilborn responsible for the whole Freeman organization's sales. What more do we need? What I'm saying, Judge, is that what she is finding is that she's accepting the government's argument that we have proven by a preponderance of the evidence that Wilborn was part of the conspiracy. That's her finding. She is not applying that to the crimes of conviction, and that's what I'm saying is missing here. And then the second problem is that even if you could say that the crimes of conviction were a joint enterprise, that his drug dealing and the counts of conviction were a joint enterprise, the court still has to make the finding that the crimes were part of the same course of conduct or common scheme or plan as the offense of conviction. And as this court has stated, there has to be some temporal connection, and I think that's what Your Honor was getting at, that there has to be some temporal connection. Even if this was a joint enterprise, there's crimes of conviction. So if there's no further question, I would save the remainder of my time for rebuttal. Thank you, Mr. Chairman. I please the court. Go counsel. Counsel for the government. Judges, on November 13, 2006, the police arrested Mr. Sanders, handcuffed him, put him in a squad car, and then searched the car in which he was a passenger. Although they call it a traffic stop, in their report written four days later, there was no traffic offense. Of course, what was well known to the police officers at the time was that a passenger in an automobile had no right to challenge, no standing to challenge the search of a car. Then, on June 18, 2007, almost eight months later, the United States Supreme Court decided Brendan v. California, which gave the passengers in an automobile reasonable expectation of privacy to challenge their arrest and the search of the car in which they were riding. If Brendan had not been decided, Sanders would have had no recourse, no success on a motion to suppress, probably not one even filed. In other words, on November 13, the police could be assured that they had a no-lose situation. They could search the car. Sanders, the black man in the back seat, had no right, no standing to challenge that, and they would win the motion to suppress. And if they got lucky and there were drugs there, good for them. What did the police know before the stop? They didn't know Sanders was in the car. Who do they think was in there? They only knew that there were two black females and one black male. What was it before he got in the car? Pardon me? Did someone get out of the car and back in the car? A man, black male, got out of the car, walked over to the Dodge Intrepid, leaned in, according to the district court, came back and got in the back seat of the Buick. But they couldn't identify him. The police officer and the other police officers all agreed they didn't know who was in the car. What makes that astounding is when the district court makes its finding regarding a Terry stop, she says that the police officers knew of Sanders' criminal record, knew of his phone calls between he and Freeman in which they discussed drugs. That couldn't have played any part in the officers' thoughts in stopping the car because they didn't know Sanders was in there. The police officer says when he ordered the black male out of the car and handcuffed him, he recognized it was Sanders. He puts him in the squad car, and then they search for the car. Except for Brendlin, Sanders loses the motion to suppress. One of the things that I'm mystified by here is the absence of a hearing on the motion to suppress. What does the evidentiary record look like? Could we resolve that issue, or would it need to go back for a hearing? The court relied on the police officer's report, which the lawyer for Mr. Sanders attached to the motion to suppress, and she relied on that and the affidavit of Mr. Sanders, which was more than sufficient to establish the privacy that Mr. Sanders had in the car. And what exactly happened? Well, if we find some merit in the legal arguments you're making, is the proper answer for us to order suppression of that evidence or to order a hearing on it? Suppression. Why? Because there were no facts. The government had the chance to present facts. Mr. Sanders had a chance to present facts. Mr. Sanders attached the police report, the government's police report. The court adopted that, and both the plaintiff and the defendant in this case agreed that those were the facts that occurred. So you don't think there's a need for a hearing? I don't think there was a need for a hearing. I'm a little concerned that you've asked the question. I'll tell you that. What changes? Brendlin changes everything. The fact is they didn't know Sanders was in the car. The other information that the district court relied on was the fact that there were drug operations in the Sheridan Road apartment, but that information was over six months old, and they had no trash pull in over a month. They didn't know who was in the car. The most astounding thing is that they didn't see anything pass between the man in the Buick who got out of the Buick and went over to the Dodge. Nothing passed between them. He got back in the car. Then the police officer says, I looked, and he appeared to be doing something down low. Appeared to be doing something. Something. What did he do? Tie his shoe? Scratch his ankle? Pick up his keys? They had a hunch there were drugs in the car. They happened to be right, but a hunch is not enough for probable cause or reasonable suspicion to sustain a Terry stop. This whole thing was under surveillance, obviously. Somebody's watching all of this occur. Somebody gets out. They're watching the apartment. They say three unknown blacks get into a Dodge Intrepid. One of them looks like, I think they say, Wilborn. They follow that car to the BP station at Clark-LaSalle just north of North Avenue. They see the black male get out of the car. They don't see anything happen. They see him get back in the car. Then the two cars drive off. The officer in charge says, Stop the Buick. They stop the Buick. They take the females out, handcuff and put them aside. They let a black male out, handcuff him, put him in the squad car. He was in the squad car after he recognized him, didn't he? Yes. But they don't know anything. They have a hunch. If, Your Honor, I have no further questions, I'll save the time to rebut what my opponent has to say. Thank you, Mr. Nash. Mr. Fullerton. May it please the Court, good morning. The District Court properly denied the motion for a mistrial. There was no evidence in the record from which the Court can conclude that any misconduct had taken place. The government properly asked the questions of Mr. Freeman's witness regarding the undercover operation on, I believe it was in August of 2006. Those questions about whether orange stripes were on offer that day implicated Rondell Freeman. Remember, the reason Rondell Freeman called that witness was to try to establish that on that day, because Blue Devils, the informant was unable to buy Blue Devils that day, that Rondell Freeman somehow had no involvement in the drug sales at the building that day. But the evidence had established throughout this whole trial that Rondell Freeman was implicated as well in the sale of orange stripes. Orange stripes were, yes, they were the personal brand of Willborn, Brian Willborn, but Rondell Freeman was conducting, was involved in a conspiracy with Brian Willborn to sell both Blue Devils and orange stripes at Cabrini Green. Orange stripes had been found in Rondell Freeman's apartment. They had been found together with Blue Devil drugs, Blue Devil brand drugs in several seizures that had taken place over the course of the investigation, including, for example, the November 13, 2006 stop in which Mr. Nash was just talking about. So Rondell Freeman was implicated by the sale of orange stripes at the building, and those questions were totally proper. Mr. Goodman argues that the government elicited false testimony somehow by asking about whether the agent had heard orange stripes on the videotape, and he offers no evidence to suggest that the agent testified falsely. In fact, there is no evidence in the record that the agent testified falsely. There was no cross-examination. There was no rebuttal. There was no attempt to reopen Brian Willborn's case, to somehow put on the witness stand somebody who had also listened to the videotape and who had been unable to hear orange stripes. The only evidence in the record shows that the agent who had reviewed the videotape prior to testifying heard the words orange stripes. This was not a surprise to Brian Willborn and Mr. Goodman. Of course, this is the very last witness of the trial. Willborn and the other defendants had rested their case by this time, and Freeman, against the advice of his lawyer, was insisting on playing this tape. So there's a lot of discussion in the transcript with the judge and the lawyers about playing the tape and whether Rondell Freeman should play the tape. I believe the district court actually heard from Mr. Freeman himself, who explained the reason why he wanted to call the witness. Mr. Goodman's concern, Mr. Willborn's concern, was that the government stipulate that none of the defendants on trial could be heard or seen on the videotape. The government readily acceded to that, that those defendants on trial were not on the videotape. But the government did indicate that it wanted to elicit the fact that orange stripes were being offered for sale. And Mr. Goodman said, well, the evidence is what it is. The jury's not going to be able to hear, tell who's on the tape, and so on. And then the tape was played. There was advance notice of what the government sought to introduce through this witness. Mr. Goodman had no objection to it, did not seek to sever his case because of it. There had been an instruction prior to the witness being called that the jury should not consider this evidence against any of the defendants who had already rested. That included Mr. Willborn. Mr. Fullerton, could we talk about some other issues here? I'm sorry? Could we talk about some other issues here? Certainly. And specifically, I'd like to ask you about the phone counts. Yes. And their status after the conspiracy conviction dropped out. As I understand it, this indictment framed the phone counts with the phrase, as charged in count one. That was the crime being facilitated, right? Well, the indictment did not allege as charged in count one. The indictment alleged a telephone call, I believe, in facilitation or furtherance of a felony violation of section 846, namely conspiracy. Without mentioning count one? The indictment did not mention count one. And the argument to the jury was all about count one, correct? That's the way those counts were argued to the jury, right? Yes, I think that's right. It is. And, in fact, well. And let me just tell you what concerns me here. Yes. I mean, obviously you don't have to link specific counts, but that's apparently the way the case was tried. And there were some similar problems, it seemed to me, that arose. You may recall some years ago, under RICO and mail fraud and wire fraud charges, there was the honest services theory for liability. Before the Supreme Court threw that out in McNally and before Congress reinstated it. And our circuit and several others concluded that where the mail fraud predicate crimes had been thrown out, the RICO convictions that were based upon those predicate crimes also had to be thrown out. I think our case is Holzer, 840 F. 2nd, 1343. I'm concerned that, in essence, the same reasoning ought to apply here. Well, Your Honor, I can't say, as I'm standing here, I'm not familiar with Holzer. I'm not recalling the facts of that case. What I can say is you're right that, in this case, the jury instructions linked the phone counts to count one. The indictment itself did not. But the instructions that linked the phone counts to count one, I think the count one instruction was basically improper. It was improper in that it told the jury that they could only convict on count one if the jury found the single specific conspiracy alleged in the indictment. That's an instruction that this court has held to be virtually always improper. And when Judge Lefkoe in the district court found that the phone counts as to Sanders and Wilborn survived the dismissal of counts one and the others and found that the Seneca-Williams testimony was not material to those counts, I think that finding could be understood, should be understood, as a finding that, had the jury been properly instructed, a properly instructed jury would have found these defendants guilty on the phone counts because a properly instructed jury would not have necessarily linked the phone counts to the count one instruction as it was narrowly crafted. When Judge Lefkoe granted a new trial on count one, didn't she find she thought there was a reasonable prospect of acquittal without Seneca-Williams testimony, false testimony? Well, she must have. Okay. And here we've got, what, about a five-year conspiracy charged? Yes. If the jury had thought the evidence really just showed a conspiracy over one year of that period, they still could have convicted them, correct? Right. So what concerns me is that we really don't know the scope of what you're describing as an improperly instructed jury's conclusion on count one. Well, we don't know the jury's conclusion as to that. We do know what the district court found on the phone counts aside from the ones. Sure. Look, everybody's trying to pick up pieces after a wreck here, right? Agreed. A train wreck of a trial. And I'm just saying I don't know if we can pick up the phone count pieces. Well, had the jury been properly instructed, the district court's finding that Seneca-Williams testimony was not material to these phone counts that survived is absolutely proper and should survive review. But we also don't know the basis of the jury's conviction, guilty findings on count one, right? Well. I mean, I understand why you link the phone counts to count one, but, okay, well. I don't want to waste your time further if you're not making progress. Well, I guess I would like to emphasize that the materiality question on these phone counts is absolutely in the government's favor because the phone counts, count four as to Wilborn and the others as to Sanders, did not in the least depend upon Seneca-Williams for the jury to understand them to be phone calls made in furtherance of a conspiracy. But they needed to be conspiracy, right, because they're not linked to the other substantive counts. That's right. Phone calls in furtherance of a conspiracy. And the calls really could be understood, standing alone, as being in furtherance of a drug conspiracy. Count four, for example, the one that Mr. Wilborn complains about the sufficiency of, that call was, I believe, a call from Freeman to Wilborn regarding the location of a third man, DeMarcus Williams, so that Freeman could find him to collect drug proceeds. Now that is a classic call in furtherance of a conspiracy that did not depend upon anything to do with Seneca-Williams and his problematic testimony. So as charged in the indictment, that conviction should stand. A call in furtherance of a felony violation of 846. Could you turn to the Wilborn sentencing and the search issues, please? I don't know what else you may want to cover, but I hope you'll cover those. Well, I want to cover sentencing and then talk about the stop of Sanders Automobile. As far as sentencing goes, the district court properly applied the guidelines to Mr. Wilborn. It first undertook to find whether or not his counts of conviction were under 1B1.3A2 part of a course of conduct or common scheme or plan that involved jointly undertaking activity with other people. It was. The district court made that finding, found that it was part of a— and specifically found on page appendix 57 that Wilborn had agreed to jointly undertake the full scope of the Freeman Drug Trafficking Organization, end quote. The district court made that finding in light of similar modus operandi between the players, the coordination of his activities with his co-conspirators, pooling of resources, knowledge by Wilborn of the details of the scheme, his intimate position in the Freeman Drug— intimate and trusted position in the Freeman Drug Trafficking Organization, and the length and degree of his participation in the scheme. Could I just briefly—I'm really perplexed at the size of this operation and the amount of money and dealing with this— this must have been a pretty big organization down below Freeman. Well, Freeman—right, it was. With that kind of amount of money that he's bringing in a week, really— tens of thousands of dollars. I don't recall the amount from the record, Your Honor, but that's plausible. Kind of vague, but that kind of an operation takes a lot of people. It does. And control a lot of areas. And that's what I'm wondering, when it gets to the people who are just going to the condo, not everybody can go there. That seems to be a place only for the most people at the top, I guess. The distribution net seems to be below that. That's all I'm asking. How big is it? This went on for nine years, right? Well, five years is what the district court found Wilborn's participation lasted, from 2002 to 2007. But the— The indictment had alleged a longer period of time. That's why I'm only asking that, because it had to be a lot of people down the line that may have been prosecuted first. I don't know. That's right. And then it kind of works up. And the district court found that Wilborn occupied a role towards the top of that pyramid. Right, that's what I'm trying to get at, about how this— And found, explicitly found, that he had jointly undertaken the entire scope of the Freeman Drug Trafficking Organization. That finding was not clearly erroneous. It was backed up by a really overwhelming amount of evidence that was introduced at trial, apart from the testimony of Seneca Williams, which the district court specifically did not refer to, did not rely on, at sentencing. So when Mr. Goodman says that the district court failed to make a finding, that the district court—that Wilborn had jointly undertaken criminal activity with others, he's in error on that. Counsel, could you—obviously, you've got—well, I tend to agree with you. There's overwhelming evidence concerning the time when Mr. Wilborn was out of prison. Certainly, the district judge could reasonably treat his activities as part of the Freeman Organization. But while he's in prison, the district judge seems to have hung her hat on just two phone calls, take my place and don't keep drugs where you live. Is there more than that? Well, there were other phone calls from prison involving Wilborn. The district court did not refer to them, in her opinion. But she found that Wilborn had participated in the organization before going to jail. And then, of course, was involved via phone while in jail. Okay. The two things she relied on seem remarkably thin in terms of actual participation while he's in prison. Tell me what else there is, if you could, or where to find it at least. Well, I think the other thing that she relied on, aside from those two phone calls, was the fact that within a very brief period of time after getting out of prison, he resumed his activity. I understand that. But we're talking about holding him responsible for this very large drug organization's activities while he's in prison. And I just, on a basis so thin, I don't think I've ever seen anything quite like it before. So what else is there? Well, the district court didn't point to anything else. I mean, one thing that I could say is that there was no evidence that he had withdrawn from the conspiracy during the time that he was in jail. He certainly knew what was going on. He had jointly undertaken those activities with others before going to prison and rejoined them after getting out of prison. In the absence of some evidence that he had withdrawn by being locked up someplace, I think it's fair to hold him responsible. Now, Your Honor gets to the issue of quantity. And I was trying to find it as I was sitting there at the table. I thought I had seen in the record, and I may be wrong, but I thought I had seen that the district court found that even if it held Willborn responsible only for those amounts after he got out of prison, the guidelines would not have changed. If there were such a finding, I would be very interested to know about it. I haven't found it yet. I don't have it at my fingertips. I seem to recall seeing that. I may be wrong. If I find it, I would love the opportunity to submit that to you. I hope we would be willing to accept a letter on that point. Thank you. So unless there are other questions about the sentencing issue, I'd like to talk about the stop and search of the automobile. And with regard to Sanders, Mr. Sanders, I think it was really taking in isolation what happened that night. The district court found that the officers had been investigating this organization for almost a year prior to the stop of the car. They had been listening to wiretaps, had been involved with these trash pulls and searches at the Sheridan condo, and so they knew that night, November 13th, that when the automobile left the Sheridan Shores building, it was an automobile registered to Willborn's mother. They thought they recognized Willborn as one of the men getting into the Dodge, and when they followed it, it went to that gas station at Clark and LaSalle that they knew from prior investigation from wiretaps was the scene of a preferential site used by Freeman for meeting with other members of his organization. So they had reason to suspect before anything happened at the gas station that there was criminal activity afoot here. And then, of course, when the meeting took place at the gas station, it was with an automobile registered to Sybil McClatchy, who was another defendant in this indictment. That Buick contained, as was said earlier, two black females and a black male. It was the black male who got out of the Buick, went over to the Dodge, had a brief meeting at the window of the car, got back into the Buick, and then the Buick drove away. But when it drove away, it drove in the direction of the Cabrini Green housing project, the housing project where the Freeman organization was controlling drug sales. Was this a traffic stop? I'm sorry? Was this a traffic stop? There was no traffic violation, I think, in support of the stop of the car. It was a reasonable suspicion that drug activity was going on. So why was it reported as a traffic stop? Well, I'm not sure. When was it first characterized for the court as a Terry stop? I think in the—I don't know the answer to that. Is there any evidence that the officers actually questioned the people who were in the car? A Terry stop is not a search of a car. Well, question them at the side of the road, Your Honor? As part—like with Mr. Terry in Terry v. Ohio, right? Certainly when Mr. Sanders— What's going on? When Mr. Sanders was recognized and identified, the police questioned him, that's for sure. Is there any evidence of that? I think there is because— And how can we do any of this? I don't understand how this motion could have been resolved without a hearing. Well, the defense did not request a hearing, and Mr. Nash today states that he does not think he needs a hearing. The district court— Well, that may not be correct. Well, the district court had before it the reports— Did the reports indicate that there was actually any investigation other than the search of the car? At the time of the stop? Yes. What we've got is a warrantless search. It was a—I don't know of any other investigation of the automobile at the time of the stop. Or of the occupants. Other than identifying them, I'm not aware of it. So how is that a Terry stop? Well, they had reasonable suspicion that that car, which met with the Dodge coming from Sheridan Shores, registered to Wilborn's mother, was going to be involved in the drug activity. When it headed towards Cabrini-Green after that meeting at that known drug— at that known place that the drug organization used, they certainly had suspicion to believe that the occupants of that car were involved in drug activity. Particularly when— So you're saying the search of the car was authorized, why? I believe it was authorized on at least a couple grounds. One, as a search for weapons. Everybody was out of the car, correct, and secured by the time that search occurred, right? I believe so, yes. So protective sweep when nobody has anything within their reach. Well, the officers had seen the occupant of the backseat, who turned out to be Sanders, making that motion low. But— As if he were hiding— He was secure in the police car, correct? He was, yes. Okay. If they had reason to detain him further, fine, but I don't understand the reason for a protective sweep at that point. Well— Maybe he's going to be let go, maybe not. Well, and maybe the female occupants of the car were going to be let go and be introduced back into that car. The officers had reason to be worried about a weapon in that car if that were to take place. Anything else for reasons for searching the car? No, I think that's it, Judge. The circumstances of the meeting and the activity of the occupant of the backseat. So unless the Court has any further questions, we'd ask that this Court affirm the convictions and sentence of the defendants. All right. Thank you, Mr. Fullerton. In answer to your Honor's question, the first time that a Terry stop was brought up was in the government's response to the defendant's motion to suppress. That was the first time it was ever raised. And led by the government, the District Court decided that it was a protective sweep in spite of the fact, as your Honor has pointed out, that the three individuals were handcuffed and secured, Sanders in the car. One question there. If he recognizes Sanders when he gets out and he's watched what went on before, so they basically arrested him as I understand it. But apparently they were going to let the girls go. They had no interest in the girls. What? They had no interest in the girls. No, but they had an interest in the car. They did. And that's one of the reasons it would seem logical to search it before letting them drive off with it. Well, it would have been logical for them to search, but what right do they have to search it? Well, because they just arrested somebody and they must watch a drug transaction. They didn't see a drug transaction. They didn't see anything take place. Okay. That's all I'm looking at is the fact that they didn't let the car go off without looking in there. They were going to search the car as they did? I'm sorry. They were going to search the car, and if they got lucky and the drugs were there, they knew Sanders had no recourse. Couldn't do anything except for Brendan. And Your Honor asked the question, did they question anybody in the stop? No. We attached to our, as an appendix, S2 to our brief that's in the supplemental one, a copy of the police report, and I wasn't the trial attorney, but it would seem to me that relying on the facts set forth in the police report were sufficient to sustain the government's motion to suppress. The district court saw it differently and used the logic that the government pointed out, wrongly so, about the information available to the police officers, namely all Sanders' criminal records, the phone calls, and the other activity that they didn't know about beforehand. And it wasn't a protective sweep. The man was in the police car, handcuffed. I would like to address for a moment, if I could, the phone calls that Your Honor has raised. It certainly looked to me like that was a viable issue when I wrote the brief, but I've twice argued before this court, once in a case, Manuel Rodriguez, I don't know the name of it, must be five, eight years ago, where the jury found the defendant not guilty of the conspiracy but guilty of the phone calls. Inconsistent verdicts are a different problem. Here we've got consistent verdicts but a tainted one. I think it was tainted. The fact was that he received eight years' sentence. If Your Honor reverses the conviction on the count 32, the main count, the substantive count, he'll have time served. You don't think the phone counts will make a big difference? Practically speaking, no. And another case that I was involved in, McGee, that I argued before this court, they found the same thing this court did with regard to that. Mr. Nance, your position is that Seneca Williams' testimony is suspect in the conspiracy setting is suspect in the phone conversation. Suspect all around, of course. And it taints the phone counts. There's no question about it. I think that Judge Lefkoe, she did the right thing by the conspiracy and she should have done with the phone counts. But on the search, you know, the government wants to rewrite history and say it wasn't a traffic stop, that's what we used to call it, now we're going to call it a protective sweep pursuant to the Terry stop. You know, I can't change what they do, but it looks like a duck,  it's a duck, and this was a duck. Thank you, Mr. Nash. Mr. Goodman. As to the sentencing of Mr. Wilbourn, yes, the district court did find that the counts of conviction have strong ties to the conspiracy, but it's our position that that is not enough to transform a sentencing on substantive counts into a conspiracy sentencing, which is what happened here. This raised Brian Wilbourn's level by being held accountable for drugs sold by Rondell Freeman, and as the court correctly points out, during three years when Brian Wilbourn was locked up in prison, that increased his offense level by an astonishing 12 levels. This case is in many ways unprecedented. I haven't seen another one like it. Many defendants will come in and enter a plea bargain to plead to substantive counts so that they can avoid conspiracy sentencing. Here we have conspiracy sentencing where there really was not a discussion by Judge Lefkoe that Brian Wilbourn aided Rondell Freeman in selling these 8 1⁄2 kilos of drugs. It was simply that it was foreseeable to him he was part of it. So for the government, in a case, if you have somebody that pleads guilty or is found guilty merely of substantive counts that are limited in time to the spring of 2006, for the government to then come in and say, well, we can prove you were part of the conspiracy by a preponderance at sentencing, seems to be very problematic. Certainly I would never advise a client to plead guilty to a substantive count if it could open him up because the fact that he was friends with a member of the conspiracy opened him up to all of the drugs that were sold. And I want to just focus the court, United States v. McMahon. It's a case cited by the government. There there's language where the court says, this court says, we look for, quote, a strong relationship between the uncharged conduct and the convicted offense, focusing on whether the government has demonstrated a significant similarity, regularity, and temporal proximity. Here we have a substantive offense, a convicted offense, of personal drug dealing by Brian Wilborn in the spring of 2006. Yes, he was connected to Rondell Freeman. He used Rondell Freeman's facilities. There's some sharing of resources. But to say that that then makes him responsible for all of the drugs sold by Rondell Freeman over a five-year period seems to be quite unjust, and it reached an unjust result in this case. The one other point that I would make is, you know, the government talks about Brian being on the top of the pyramid. There was no such finding. And in fact, if you look at Judge Lefkoe's findings of fact during the sentencing hearing, at one point she considers the evidence that Brian Wilborn exercised control and authority over others, which was a factor for the manager role. The district court says, quote, I would say it is maybe somewhat thin. I would say there is some evidence of that. And, again, she focused mainly on the phone call from prison when he tells his friend to step up as evidence of exercising control. There was no evidence that this is another part of the case that was not delivered on by the government, that Brian Wilborn was his right-hand man in managing these operations. I see my time is up. Thank you. Thank you, Mr. Goodman. Our thanks to all counsel. Goodman, in defense. And to Mr. Nash and to Mr. Goodman, you have the additional thanks to the court for accepting this appointment and ably representing the defense. Thank you. As you can see, we enjoyed it. Case is taken under advisement.